## NAPIER *v.* ADAMS.

No. 7954.   MARCH 13, 1931.

*Brock, Sparks & Russell,* for plaintiff.

*Harris, Harris & Popper,* for defendant.

HINES, J.   This is the second appearance of this case in this court.   *Napier* v. *Adams,* 166 *Ga.* 403 (143 S. E. 566).   It will appear from the case when it was here before that the right of Napier to recover depended upon whether Callaway was the dual agent of Napier and Adams, and that the fact of this dual agency was unknown to Napier.   Napier in his testimony on the trial of this case gave the following history of how he came to purchase the realty for a portion of the purchase-price of which he is being sued by Adams:

In July, 1925, Napier went on an excursion from Macon, Georgia, to Coral Gables, Florida.   He was introduced by some Macon people to Callaway.   These people recommended Callaway highly as a gentleman, a fair man to deal with, and a man well posted on values of real estate in Miami, Florida, as he had lived there for several years.   Napier told Callaway that he did not know anything about values in Miami, and would have to depend entirely on him.   Callaway showed Napier a certain piece of property in Miami, which he had for sale.   Callaway told Napier that this piece of property could be bought, he thought, for $85,000.   Napier told Callaway he would depend entirely on his judgment as to the value, and that he would rely on Callaway's judgment in buying that property.   Napier had never been in Miami before, and had no knowledge of the value of real estate there.   Callaway told Napier that that property for $85,000 was the best value he had.   He recommended it to Napier and advised him to buy it.   Thereupon, on July 14, 1925, Napier entered into a contract in writing touching the purchase of this property.   This contract recites the receipt from E. Tris Napier Company of $4,000 "as a deposit for an option, which, if accepted by the owner, is to apply as part payment on the purchase-money of" this property.   It further stipulates that the full purchase-price of this property is $85,000, to be paid as follows:   $30,000 cash, of which the above $4,000 shall be a part,

balance in one, two, and three years from closing date, with eight per cent. interest per annum, payable semi-annually. It further provides that if the owner of the property does not approve the terms of this contract, or other terms agreeable to the parties, or if the owner can not furnish good title to the above property, or if for any other reason the same can not be delivered in a reasonable time, the above deposit is to be returned to Napier. The contract further provides that "It is understood and agreed that this contract is conditioned upon delivery of the above-described property to the said J. B. Adams by C. F. Thatcher." The contract further contains this provision: "I hereby agree to purchase the above-described property on the terms and conditions above mentioned." The contract was signed "E. Tris Napier Co., By E. Tris Napier, Pres., Purchaser." Napier knew this contract had to be taken to Adams for confirmation before it became binding upon him. It was taken to Adams for approval and confirmation; and he added thereto the following: "I hereby approve the above-mentioned sale, and agree to pay to Walter P. Callaway the sum of forty-two hundred and fifty and no/100 dollars out of the first cash payment as commission for making said sale. Callaway to take note for $250.00 of above commission, due 12 months from closing date, or $4,000.00 cash." The above was signed "J. B. Adams, Trustee, Owner." The above contract and confirmation thereof by Adams was mailed to Napier and received by him on July 16, 1925. The check for $4,000 given by Napier to Callaway on the above contract was indorsed by Callaway to Adams. A duplicate of the contract and confirmation thereof was kept by Adams. After receiving the contract of sale and the confirmation thereof, Napier went to Miami and closed the contract of purchase. Napier testified that on July 23, 1925, before he went to Miami, "he knew about the whole transaction all the way through." Thereafter, on August 8, 1925, Napier gave to Callaway his sight draft for $25,370.65, drawn on the Miami Bank & Trust Company, in part payment of the purchase-price of this property. At that time the contract of purchase with its confirmation by Adams had been in the possession of Napier since July 16, 1925.

Napier nowhere testifies that he did not have full knowledge of the terms of this contract and the approval and confirmation thereof at the time the trade was finally concluded. By the contract of sale

Napier was charged with knowledge of the fact that Callaway was acting as the agent of Adams in selling this property, and that Adams was to pay Callaway for his services in negotiating this trade commission amounting to $4,000 at least. It is true that Napier testified that he thought the proceeds of his check to Callaway for $4,000 was to pay the commissions of the latter in this transaction. This conclusion of Napier is contradicted by the plain terms of the written contract of sale, and by his testimony that the amount of his check was to pay a part of the total purchase-money of $85,000. So it appears that Napier was paying Callaway no commissions as his agent for services in this transaction. We are of the opinion that a finding under the testimony of Napier and the unequivocal terms of the contract of sale, was demanded that, if Callaway can be considered as acting as the dual agent of Adams and Napier in this transaction, Napier knew of the dual agency, and was not in a position to repudiate the transaction upon the ground that Callaway was the dual agent of Adams and Napier, and that he was ignorant of such dual agency. In these circumstances a verdict in favor of Adams was demanded; and this renders it unnecessary to pass upon any of the assignments of error embraced in the motion of Napier for a new trial.

*Judgment affirmed. All the Justices concur, except Gilbert, J., disqualified.*